UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

VINCENT ROGERS,
    Plaintiff,

v.

CITY OF NEW BRITAIN, *et al.*,
    Defendants.

No. 3:12-cv-1626 (SRU)

**RULING AND ORDER**

Vincent Rogers (or Rodgers)[1] is an African American employee of the City of New Britain who has worked for over a decade in its Water Department. He brings this lawsuit against his employer and several supervisors. He pleads a variety of claims, as discussed below, but they are principally claims of a racially hostile work environment and unlawful retaliation under Title VII of the Civil Rights Act and 42 U.S.C. § 1983. The defendants filed the present motion for summary judgment. For the reasons that follow, that motion is granted in part and denied in part.

**I.    Standard of Review**

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all

---

[1] The name on his complaint is spelled "Rogers," and for that reason both sides use that spelling in their briefs, but in his deposition the plaintiff spelled it "Rodgers."

reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d. 520, 523 (2d Cir.), *cert. denied*, 506 U.S. 965 (1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of his pleadings, but must present sufficient probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247–48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is

appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

## II. Background

The plaintiff, Vincent Rogers, is an African American man who has worked for the New Britain Water Department since 2003. At relevant times, Mark Zenobi and Ken Marzi[2] were his supervisors (Zenobi is identified as Rogers's immediate supervisor), and Gilbert Bligh was the director of the Water Department. Rogers brings suit against all three of them in their individual and official capacities, along with the City of New Britain, the New Britain Water Department, and "Jane Doe, John Doe, and other unnamed individuals." The precise nature of all of the claims (and the differences between some of the counts as they are enumerated in the complaint) is less than clear, because the complaint (as well as the briefing on both sides) makes extensive use of boilerplate recitations, with some repetitions and what appear to be occasional copy/paste errors. It is clear, however, that the essential allegations are of a racially hostile work environment—or, perhaps more accurately, of a generally and indiscriminately hostile work environment, frequently anti-gay (Rogers does not allege that he is gay nor that he was ever the target of anti-gay hostility, though he found it inappropriate), and of a few specific racial incidents.

---

[2] In some places the complaint says "Manzi," but the caption names him "Marzi," and the latter is the name he indicated in his deposition.

3

Rogers alleges that one day in 2004, on a Friday while he was clocking out at the end of the day, a co-worker named Dean Sasso (who is not a defendant, and is white) said something to the effect of "What's up, my nigga?"[3] Rogers was shocked and offended by this, and he left. Shortly thereafter, he wrote a letter to management complaining of the incident, but he alleges that Sasso was never disciplined. A fact-finding proceeding occurred, at which Sasso denied using the slur (and Rogers was not asked to testify).[4] Sasso admitted no fault but agreed to attend sensitivity training. Rogers was not satisfied by that outcome, but he does not allege any further problems with Sasso or any concrete problems at work for a number of years, during which time he received satisfactory job evaluations.

In September 2010, he was at a job site in the field and mistakenly turned a valve the wrong way, which caused water to flow into a trench where another worker was standing. That worker was not injured (the complaint says the mistake "almost caused injury" and the summary judgment briefs suggest the worker was forced against a building foundation by the water), but Rogers alleges that the worker got in his face, cursed at him, and threatened to kill him. That worker was "Mario" (last name unknown to Rogers) and apparently an independent contractor with whom Rogers did not regularly work. Rogers was found at fault for turning the valve the wrong way in a fact-finding proceeding. It is not clear whether he ever saw "Mario" before or since (but he names him as a "Doe" defendant).

In January 2011, Rogers repeatedly received an undesirable work assignment ("pipe gang"). Such an assignment was supposed to go through a rotation with other employees (who are white), and Rogers alleges that he unfairly received the assignment several times

---

[3] The complaint, briefs, and deposition transcripts variously reflect the epithet as "the N word," "nigger," and "nigga." Rogers does not allege that Sasso used the word with anger or intentional hostility, but the word was nevertheless offensive to him.

[4] The use of the epithet was corroborated by Mark Zenobi in his deposition for this case, however. He said that he overheard it. (*See* Zenobi dep. at 59, 92).

consecutively, out of the rotation. He complained to Marzi, who did not acknowledge the problem to Rogers's satisfaction. It happened again, and he accused Marzi of racial discrimination. He says that Marzi was angered by that accusation, slammed his seat angrily backward, walked over to Rogers, pointed his finger at him, and got in his face. A request for sick leave that Rogers had previously requested was subsequently denied.

The following month, on February 11, 2011, Rogers arrived at work and saw that on the loading dock area there was a stuffed gorilla wearing Rogers's work shirt (which has his name on it). He says that Zenobi and others laughed, and that he believed Zenobi had placed it. He took photos to document the incident and complained that the gorilla was a racist display that was intended to mock him. Marzi told him not to take it personally, that it was the work of a "sick person" who "needed counseling," and told Zenobi to throw the gorilla in the dumpster. Bligh undertook an investigation into the incident, and Zenobi denied placing the gorilla. There was security camera footage of the person placing the gorilla, but it was apparently of low quality, and the results of the investigation were inconclusive. Bligh recommended to the personnel director that diversity training be arranged for all Water Department staff at that location. It is not clear whether that training ever took place.

Rogers filed an administrative complaint claiming employment discrimination, received a right-to-sue letter, and then filed the present complaint. He pleads thirteen counts, but the complaint is somewhat unclear and redundant, with apparent overlap among claims. It appears that some claims might not have been pursued or might have been included only as a result of sloppy copying and pasting. For instance, Rogers alleges age discrimination under the Age

Discrimination in Employment Act (Compl. ¶ 26) (he is in his 40s) but does not appear to plead any facts to support such a claim nor to have pursued it in discovery.[5]

Rogers enumerates his claims as follows:

- Count 1, pleading *Monell*/supervisory liability against New Britain;
- Count 2, pleading Title VII disparate treatment against New Britain and the Water Department;
- Count 3, pleading claims against Bligh, Marzi, and Zenobi under 42 U.S.C. §§ 1981, 1983, 1985, 1986, and 1988;
- Count 4, pleading claims against Bligh under Sections 1981, 1983 and 1988;
- Count 5, pleading claims against Bligh, Marzi, and Zenobi under Sections 1985(3) and 1988;
- Count 6, pleading claims against Bligh, Marzi, and Zenobi under Sections 1986 and 1988;
- Count 7, pleading claims against Bligh, Marzi, and Zenobi for intentional & negligent misrepresentation (specifically: the representation that Rogers would be treated fairly and without discrimination);
- Count 8, pleading an assault claim against Marzi for putting Rogers under the "apprehension of harmful or offensive contact" in the January 2011 incident when Marzi allegedly responded angrily to Rogers's accusation of racial discrimination;
- Count 9, pleading an assault claim against "Mario" the contractor over the incident when Rogers turned the valve the wrong way;
- Count 10, pleading a battery claim against Marzi for "bumping" Rogers during the January 2011 incident that is subject to the Count 8 assault claim;
- Count 11, pleading *Monell*/supervisory liability against New Britain for failure to supervise/train on the subject of racism in the workplace; and
- Counts 12 & 13, both pleading Title VII retaliation against both New Britain and the Water Department (these two counts are mostly identical, with only a few scattered differences, and the logic of their separation into two counts is not clear).

The defendants filed the present motion for summary judgment.[6] In his opposition to their motion, Rogers withdraws the Sections 1985 and 1986 claims from Counts 3, 5, and 6; he

---

[5] The plaintiff is not alone in this sloppiness. For instance, the defendants' summary judgment papers use the wrong pronoun for the plaintiff (*see* Mem. Supp. Summ. J. 21 ("The plaintiff has failed to establish a triable issue of material fact on her claim . . . .")) and contain an entire page and a half about claims of intentional infliction of emotional distress, which the plaintiff did not plead (*id.* at 21–22).

[6] They also filed a motion to dismiss, solely on the grounds that the complaint was filed more than 90 days (in fact: 91 days) after the date on the right-to-sue letter. Rogers argued in opposition that the 90-day clock begins upon receipt, which would have been several days after the date on the letter; the defendants argued that the clock should

withdraws Count 7 (misrepresentation) in its entirety; Count 9 (against "Mario") in its entirety; and Count 10 (battery against Marzi) in its entirety. He seems also to consolidate several of his separately enumerated counts against the City and the Water Department, indicating that Counts 12 and 13 are "analyzed under Count 2."

**III.    Discussion**

Carefully parsing the complaint to determine the precise nature and number of the claims or to cite them by count number is not very fruitful, but on the basis of the complaint and the papers on the summary judgment motion, it appears that all claims that have actually been pleaded and pursued and not withdrawn are divisible into three broad groups, and I will treat them accordingly: (1) *Monell* and Title VII claims against the City of New Britain and the New Britain Water Department for disparate treatment, retaliation, and hostile work environment; (2) claims under Section 1981, 1983, or 1988 against Bligh, Marzi, and Zenobi, which, however brought, seem to amount essentially to disparate treatment, retaliation, or hostile work environment claims; and (3) an assault claim against Marzi for the January 2011 incident.[7]

A. <u>Retaliation or Disparate Treatment</u>

Rogers's retaliation and disparate treatment claims are not artfully pleaded or well argued in his briefing and the evidence to support them is not well organized, perhaps because his focus is so clearly directed to the incidents giving rise to the hostile work environment claims. He does, however, suggest that the denial of his requested sick leave after the January 2011 incident with Marzi, and the filing of negative work evaluations after years of positive ones, were retaliation for complaining of racial discrimination; and that he was passed over for a promotion that he

---

start with the date on the letter because it was received (by counsel) via email on that date, in addition to being mailed. I denied the motion from the bench on May 8, 2014.

[7] To the extent Rogers intended to plead any other claims not included in those three groups, they are dismissed as insufficiently pleaded or abandoned.

wanted to train for (or thought he was being trained for) that went to a white co-worker instead (in fact, it went to Sasso, the co-worker who allegedly called Rogers "my nigga" and is now apparently his supervisor).

Retaliation claims are reviewed under the burden-shifting approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "Under the first step of the *McDonnell Douglas* framework, the plaintiff must establish a prima facie case of retaliation by showing 1) participation in a protected activity; 2) the defendant's knowledge of the protected activity; 3) an adverse employment action; and 4) a causal connection between the protected activity and the adverse employment action. The plaintiff's burden of proof as to this first step has been characterized as 'minimal' and '*de minimis.*'" *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013).

Protected activity includes "report[ing] and protest[ing] workplace discrimination, whether that discrimination be actual or reasonably perceived." *Matima v. Celli*, 228 F.3d 68, 78 (2d Cir. 2000). That reporting of discrimination includes "the filing of formal charges of discrimination as well as . . . the making of informal protests of discrimination, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges." *Id.* at 78–79 (quotations omitted).

The Supreme Court held in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), that Title VII's "antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment," *id.* at 64, thereby abrogating stricter standards for "adverse employment action" in retaliation claims that prevailed in some circuits (including the Second). Rather, in order to satisfy the adverse-

employment-action prong for a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (quotations omitted). In *Burlington Northern*, the "adverse" action supporting the retaliation claim—the sufficiency of which the Supreme Court affirmed—was a laborer's reassignment away from the more desirable forklift work to less desirable tasks following a claim of sex discrimination.

Rogers's written complaint about being called "my nigga" and his oral accusation of racial discrimination in connection with being assigned to "pipe gang" duty multiple times out of rotation both qualify as protected activity.[8] The defendants were aware of that activity. Rogers's continued assignment to "pipe gang" duty after complaining of discrimination, denial of sick leave, negative work evaluations, and an environment of heightened racial hostility could all be adverse actions insofar they could dissuade a reasonable worker from making a charge of discrimination. The first three prongs of his prima facie case are therefore clearly satisfied. The prong that is least clearly satisfied is the fourth—that is, the causal connection between the protected activity and adverse actions—but the proximity in time between the complaint about "pipe gang" duty and the denial of leave and the gorilla incident weigh in favor of a causal connection.

The defendants offer non-discriminatory motives: an emergency (specifically, a broken water main) requiring his work on the "pipe gang" to explain the denial of leave; and actual lapses in his performance (most notably, the incident of turning the valve the wrong way) to explain the changed performance evaluations. They do not appear to offer a non-discriminatory

---

[8] Rogers does not allege any retaliation for the first incident, which was years old by the time of the second. The first incident could nevertheless contribute to a view on the part his supervisors that Rogers was a repeat complainer, and could serve as evidence for the broader claim of a hostile work environment, discussed below.

motive for assigning Rogers to "pipe gang" duty out of rotation, but it is not clear that they concede he was assigned out of rotation, so there may be a question of fact on that issue. Rogers does not offer much to specifically rebut those alleged motives as pretextual, but (especially in light of the hostile work environment allegations, discussed below) a reasonable jury likely could find that they were retaliatory for complaining of discrimination. To that extent, the summary judgment motion is therefore denied.

      The allegation of being passed over for the promotion is weaker, because Rogers apparently did not apply for the promotion, and, even if he had applied, he had (by at least one method of reckoning) less seniority than the person who received it. Though he alleges disparate treatment in his complaint and speaks vaguely in his deposition about black police and other city employees being treated differently than their white counterparts, he does not offer any particular evidence of disparate treatment in hiring or promotion for black candidates generally. He does not appear to be bringing claims on behalf of other black employees (and offers no evidence about any others), and he does not offer any evidence tending to show that he and the employee who was promoted were similarly situated. Summary judgment is therefore granted in favor of the defendants with respect to claims of disparate treatment.

    B. <u>Hostile Work Environment</u>

      The standard for hostile work environment claims is high:

> A hostile work environment claim requires a showing (1) that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and (2) that a specific basis exists for imputing the objectionable conduct to the employer. The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [his] employment were thereby altered. This test has objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that

> environment to be abusive. As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive. Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (noting that "[w]e have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment"). But it is well settled in this Circuit that even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace. *See, e.g., Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (vile and sexually explicit verbal abuse of a female firefighter that challenged her competence, was witnessed by a large group that included her subordinates, and created a justified fear that she would be left in peril at fire scenes); *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999) (observing that a single sexual assault may be sufficient to alter the terms and conditions of the victim's employment).
>
> In short, a plaintiff alleging a hostile work environment must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment. To decide whether the threshold has been reached, courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse.

*Alfano v. Costello*, 294 F.3d 365, 373–74 (2d Cir. 2002). The Second Circuit has emphasized both that a hostile work environment claim requires an *extremely* hostile environment and that a single incident *can* be sufficiently severe. As another Circuit has written, "saying that a single incident of workplace conduct *rarely* can create a hostile work environment is different from saying that a single incident *never* can create a hostile work environment. The test set forth by the Supreme Court is whether the alleged conduct is 'sufficiently severe *or* pervasive'—written in the disjunctive—not whether the conduct is 'sufficiently severe *and* pervasive.' A single, sufficiently severe incident, then, may suffice to create a hostile work environment." *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 579 (D.C. Cir. 2013).

Several circuits have suggested that the particular racial history of the word "nigger" (and perhaps, by analogy, associated anti-black imagery) is especially likely to be "sufficiently severe." The Second Circuit has "emphasize[d] that perhaps no single act can more quickly alter

11

the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24 (2d Cir. 2014) (quotation omitted). *See also Jackson v. Flint Ink North American Corp.*, 370 F.3d 791, 795 (8th Cir. 2004) ("Even a single instance of workplace graffiti" involving a burning cross, "if sufficiently severe, can go a long way toward making out a Title VII claim"), *rev'd on reh'g on other grounds*, 382 F.3d 869 (8th Cir. 2004).[9]

The alleged use of the word "nigger" or "nigga," even if used jocularly and not by a supervisor (though by a man who apparently *is* Rogers's supervisor now), is shocking and severe. That incident might have been too old at the filing of the complaint to constitute a viable independent cause of action (though the defendants do not raise that argument), but it serves as evidence tending to support a claim, based on later conduct, that Rogers was subjected to a racially hostile environment. The dressing-up of a stuffed gorilla in Rogers's work clothes is also shocking and severe. In light of the exceptionally ugly history of depicting African Americans as apes—and by analogy to the history of the word "nigger," *see Ayissi-Etoh*, 712 F.3d at 580 (Kavanaugh, J., concurring opinion), and to the history of the image of the burning cross, *see*

---

[9] In a recent concurring opinion, Judge Kavanaugh of the D.C. Circuit wrote at length about the salience of history to claims of hostile work environment:

> It may be difficult to fully catalogue the various verbal insults and epithets that by themselves could create a hostile work environment. And there may be close cases at the margins. But, in my view, being called the n-word by a supervisor—as Ayissi-Etoh alleges happened to him—suffices by itself to establish a racially hostile work environment. That epithet has been labeled, variously, a term that "sums up ... all the bitter years of insult and struggle in America," Langston Hughes, The Big Sea 269 (2d ed. 1993) (1940), "pure anathema to African-Americans," *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001), and "probably the most offensive word in English," Random House Webster's College Dictionary 894 (2d rev. ed. 2000). *See generally* Alex Haley, *Roots* (1976); Harper Lee, *To Kill a Mockingbird* (1960). Other courts have explained that "perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of ... 'nigger' by a supervisor in the presence of his subordinates." *Spriggs*, 242 F.3d at 185. No other word in the English language so powerfully or instantly calls to mind our country's long and brutal struggle to overcome racism and discrimination against African-Americans.

*Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 580 (D.C. Cir. 2013) (Kavanaugh, J., concurring opinion).

*Jackson*, 370 F.3d at 795—that act might be sufficiently severe by itself to make a hostile work environment. A jury could find that hostility especially evident in the fact that the incident occurred in the aftermath of Rogers's complaint of racial discrimination—which proximity might suggest that it was not done in ignorance of the ugly history of racially abusive caricature.

The two incidents were separated by quite a few years, which may weigh against linking them closely, but both are severe, and there are indications that the Water Department understood they were severe: both were investigated, at least nominally; one resulted in a few sessions of "sensitivity training" though no admission of guilt; one resulted in a recommendation that all staff at the location undergo "diversity training" and Marzi's acknowledgement that it was perpetrated by a "sick" person who "needed counseling." But Rogers points to evidence that both efforts could reasonably be understood as half-hearted, if not perfunctory: Rogers was not called as a witness in the first incident, and there was apparently no finding of guilt though Rogers's account was corroborated in a deposition of a defendant in this case who was apparently not questioned at that time; no culprit was ever identified in the second incident despite the existence of a video; and it is not clear that the recommended training ever occurred.

Rogers also alleges persistent anti-gay hostility, with workers frequently being called "faggits" [sic], and though he does not address (nor do the defendants) his presumed lack of standing to raise claims on the basis of that hostility since he was not the target of it, those allegations do tend to support the view that the workplace was a generally and broadly hostile and antagonistic one, and that such an environment was tolerated by management. The gorilla incident alone may be enough to deny the defendants' motion for summary judgment with respect to claims of a hostile work environment, but all of the aforementioned factors in combination are surely enough.

C. Assault

"A civil assault is the intentional causing of imminent apprehension of harmful or offensive contact in another." *Dewitt v. John Hancock Mut. Life Ins. Co.*, 5 Conn.App. 590, 594 (1985) (quoting 1 Restatement (Second), Torts § 21). No contact is required, but "only 'an overt act evidencing some corporeal threat,'" which can "transform 'mere words' into an assault." *Miller v. Edward Jones & Co.*, 355 F. Supp. 2d 629, 647 (D. Conn. 2005) (citing *Norman v. Distasio*, No. CV960389982S, 2001 WL 761135, at *3 (Conn. Super. June 15, 2001))

Rogers's allegations that Marzi angrily "slammed" his chair back after Rogers accused him of racial discrimination, that he then left his place in order to more closely approach Rogers, and "got in his face," are sufficient to make out a claim of assault under Connecticut law. The defendants offer no coherent argument to the contrary. The nature of that interaction creates questions of fact for a jury and should not be resolved on summary judgment.

D. Which Claims Against Which Defendants

1. *Title VII and Section 1983*

Rogers pleads claims (at least formulaically) under Title VII and under Section 1983,[10] but the parties do not clearly distinguish them. Claims of a hostile work environment can be brought under both statutes (the Section 1983 claim being an Equal Protection claim). *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006). "Once action under color of state law is established," the two claims "parallel" each other and "[t]he elements of one are generally the same as the elements of the other and the two must stand or fall together." *Feingold v. New York*,

---

[10] In fact, Rogers nominally pleads claims (which he has not withdrawn) under Sections 1981, 1983, and 1988, but neither he nor the defendants clearly distinguishes them. Section 1981 would be useful to him if he worked for a private employer, but because his employer is a municipality, I construe his constitutional claims as being brought under Section 1983. Section 1988 authorizes attorney's fees for prevailing parties in civil rights actions, but it does not support an independent cause of action.

14

366 F.3d 138, 159 (2d Cir. 2004). "Except, of course, that unlike a Title VII claim a Section 1983 claim can be brought against individuals." *Id.* at 159 n.20.

2. *The Water Department as a Defendant*

The defendants argue that summary judgment must be granted for the Water Department, because it is not a legal entity capable of being sued. Rogers fails to address that argument in his opposition, but after that failure was pointed out in the reply, he filed a surreply that discusses it. That discussion, however, does not seriously engage with the question. He attaches the Charter of the City of New Britain, and argues that the Water Department is an "agent" of the City, pointing out that the individual defendants who work for the Water Department are technically employees of the City. Even granting everything he says, he is no closer to establishing the propriety of naming the Water Department as a separate defendant rather than the City alone.

The problem, which Rogers does not address, is described in detail by Chief Judge Janet C. Hall in *Watrous v. Town of Preston*, 902 F. Supp. 2d 243 (D. Conn. 2012):

> By Connecticut statute, any municipality has the power to sue and be sued. Conn. Gen. Stat. § 7–148(c)(1)(A). Municipality is defined as "any town, city or borough, consolidated town and city or consolidated town and borough." Conn. Gen. Stat. § 7–148(a). Unless municipal departments constitute separate "bodies politic" under state law, the proper defendant is the municipality, not the municipality's administrative subdivision. *See Levine v. Fairfield Fire Dep't.*, No. X01 CV890146670S, 1999 WL 241734, *3 (Conn. Super. April 9, 1999) (unpublished). In determining whether a municipal subdivision constitutes a separate body politic, courts have looked to whether a specific statute enables the entity to sue or be sued. *See Luysterborghs v. Pension & Ret. Bd.*, 50 Conn. Supp. 351, 355, 927 A.2d 385 (Conn. Super. 2007); *see also Zahrijczuk v. Branford Water Pollution Control Auth.*, 52 Conn. Supp. 422, 423–25, 50 A.3d 421 (2012) (unpublished).
>
> Connecticut law does not generally establish that all municipal subdivisions are legal entities separate from the municipality itself. *See Luysterborghs*, 50 Conn. Supp. at 355, 927 A.2d 385. Instead, the legislature has explicitly granted such independent legal status only to certain specific departments. *See, e.g.*, Conn. Gen. Stat. § 10–241 ("Each

15

> school district shall be a body corporate and shall have the power to sue and be sued"); Conn. Gen. Stat. § 7–233e (stating that municipal electric energy cooperatives are classified as a "public corporate body and politic" and may "sue and be sued"). Courts have found the absence of a specific enabling statute to be dispositive in determining that a municipal body is not a distinct body politic. *See, e.g., Luysterborghs*, 50 Conn. Supp. at 356, 927 A.2d 385 (holding that municipal pension boards may not be sued); *Himmelstein v. Town of Windsor*, No. HHDCV054013928S, 2006 WL 1493229, *3 (Conn. Super. May 16, 2006) ("[M]unicipal police departments do not constitute an independent legal entity amendable to suit."). At least one Connecticut court has held that entities whose definition as "quasimunicipal corporations" is well-established by the Connecticut Supreme Court may be found capable of suing and being sued despite the absence of explicit statutory authorization. *See Zahrijczuk*, 52 Conn. Supp. at 434, 50 A.3d 421.

902 F. Supp. 2d at 255–56. Rogers does not point to any statute granting the Water Department the capacity to sue or be sued, and there does not appear to be one. Nor does he point to any decision of the Connecticut Supreme Court establishing that the Water Department is a "quasimunicipal corporation." I therefore conclude that the Water Department is not a proper defendant, and any claim Rogers brings against his employer should be a claim against the City of New Britain.

      3.  *Municipal Liability and Liability in Official or Individual Capacities*

The Supreme Court held in *Monell v. Department of Social Services* that a municipality is not liable under Section 1983 for the constitutional torts of its employers solely on a *respondeat superior* basis. 436 U.S. 658, 690 (1978). Instead, in order to establish municipal liability, the plaintiff must prove three elements: (1) the existence of an official policy or custom, (2) which caused the plaintiff's harm, (3) which harm is the denial of a constitutional right. *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995). The first prong may be satisfied in one of several ways. A plaintiff may show: (1) the existence of an official policy, *Monell*, 436 U.S. at 690; (2) that an official with final policy-making authority took action or made a specific decision that

caused the deprivation, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986); or (3) the deprivation was caused by an unlawful practice amongst subordinate officials that was so widespread as to imply constructive acquiescence by policy-making officials, *City of St. Louis v. Prapotnik*, 485 U.S. 112, 127 (1988) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–168 (1970)).

  As discussed above, Rogers's claims under Section 1983 are Equal Protection claims, so in order to satisfy *Monell*, he must show in one of those three ways that that constitutional deprivation was caused by an official policy or custom. He does not allege that there was an official policy of racial hostility, and though he cites the language of the standard it is not clear that he alleges or offers evidence that Bligh (the Director of the Water Department) was "an official with final policy-making authority." He does argue, however, that the conditions of the hostile work environment were "so widespread as to imply constructive acquiescence." In light of the epithet incident and the gorilla incident, the fact that both were complained of, that both were investigated, and that both resulted in minimal response (and perhaps supported by allegations of pervasive homophobic humor and jocular abuse), the evidence could support a jury finding that knowledge of the hostile work environment was communicated up the chain of command, that its seriousness was known, but that it was tolerated or handled only perfunctorily, implying constructive acquiescence.

  Rogers therefore has a viable Section 1983 claim against the City. His claims against his supervisors in their official capacities are subject to the same analysis. "Section 1983 claims against municipal employees sued in their official capacity are treated as claims against the municipality itself." *Seri v. Town of Newtown*, 573 F. Supp. 2d 661, 671 (D. Conn. 2008)

(citations omitted). "Therefore, in order to assert a viable claim against a municipal employee in his official capacity, the plaintiff must have a viable *Monell* claim against the municipality." *Id.*

Rogers's claims against Zenobi, Marzi, and Bligh in their individual capacities bear somewhat more scrutiny. His testimony and limited documentation constitute evidence tending to support his allegations that Zenobi and Marzi, as immediate or near-immediate supervisors, were directly complicit in the creation of a hostile work environment and retaliation for his complaint (through the assignment of "pipe gang" duty out of rotation, the denial of sick leave, negative work evaluations, and the gorilla incident). Summary judgment for Zenobi and Marzi with respect to those claims is therefore inappropriate. Rogers's only allegations against Bligh are more distant, because Bligh was not an immediate supervisor but rather the Director of the Water Department. Bligh investigated the gorilla incident, but the suggestion that his performance of that investigation was lackluster is not sufficient to attach individual liability under Section 1983 with a retaliation theory or one of hostile work environment. Summary judgment is therefore granted for Bligh in his individual capacity.

E.  Qualified Immunity

The defendants also argue that they are entitled to qualified immunity. The doctrine of qualified immunity protects government officials from suit if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The qualified immunity inquiry must be limited to the law at the time of the alleged violation, and "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). "To be 'clearly established,' '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"

*Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

The right under Title VII and Equal Protection to be free from racial discrimination and abuse in the work place was clearly established long before the events at issue. The defendants make no persuasive argument that reasonable officials could have been under the misapprehension that workplace racial abuse of the sort Rogers alleges was statutorily or constitutionally acceptable. Summary judgment cannot be granted on the basis of qualified immunity.

## IV.   Conclusion

The defendants have not met their burden as movants to show that Rogers's claims of a hostile work environment and retaliation under Title VII and Section 1983 fail as a matter of law or that the evidence proffered is insufficient as a matter of law to sustain them. The motion for summary judgment is therefore denied with respect to those claims against the City of New Britain and the three individual defendants in their official capacities, and against Zenobi and Marzi in their individual capacities. It is also denied with respect to the assault claim against Marzi. The Water Department is not a proper defendant, and Rogers has not offered sufficient evidence to sustain a discrimination claim against Bligh in his individual capacity, so to that extent summary judgment is granted in favor of those defendants. Nor has Rogers offered sufficient evidence for a reasonable jury to find in his favor on a failure-to-promote or failure-to-hire or a similar claim of disparate treatment, and summary judgment is therefore granted in favor of the defendants with respect to any such claim.

In sum, this case will proceed on (1) claims of hostile work environment and retaliation under Title VII and Section 1983 against the City of New Britain, Bligh in his official capacity,

and Zenobi and Marzi in their official and individual capacities; and (2) the claim of assault against Marzi. Summary judgment is granted in all other respects.

    So ordered.

Dated at Bridgeport, Connecticut, this 17th day of May 2016.

                                            <u>/s/ STEFAN R. UNDERHILL</u>
                                            Stefan R. Underhill
                                            United States District Judge